## J. L. KEAUNUI ET AL., *vs.* H. POKA ET AL.

EJECTMENT—ON WRIT OF ERROR.

THE PARTIES TO THE SUIT agreed to take a verdict for one-half of the land each;

HELD, that a writ of error will not lie to correct the mistake of the plaintiff in consenting to such a verdict.

Opinion of the Court by JUDD, J.

This is a writ of error *coram nobis*, and the following is the assignment of error: "That an action of ejectment was by them (the plaintiffs) entered in the July Term, 1879, of the Supreme Court against said Poka and all above named, and that said action came on to be heard at said term before a jury,

J. L. Keaunui et al. *v.* H. Poka et al.

and a verdict was returned for the plaintiffs for one-half of the premises claimed. And your petitioners deem themselves aggrieved by said verdict and assign the following cause of error, viz.: During said trial it was proved that Kekuaiwahia, w., the awardee and owner of the premises in dispute, died in the year 1848, leaving her surviving, her husband Poka, no children, and other kindred of her own, through whom these plaintiffs claim; and that her husband Poka died a few days after her. And the jury were thereupon instructed that said Poka was heir of one-half of the property of said Kekuaiwahia; and that the plaintiffs were entitled to one-half only, they claiming through the kindred of said Kekuaiwahia. And your complainants say, that at the time of the death of said Kekuaiwahia and Poka, the statute of descent now in force had not been enacted; and that by the law then in force said Poka was not entitled to any part of the property of his wife as his heir, but that all her property descended to her kindred at the expiration of the courtesy of her husband."

The following is the record in the case: "The parties to the suit having agreed to take a verdict for one-half of the land, and each pay one-half of the costs, the Court, at 11:45 A. M., addresses the jury and directs them to bring in a verdict accordingly; and without retiring the jury returned a unanimous verdict for the plaintiffs of one-half the land, the defendants to have the other half. The costs to be equally divided."

BY THE COURT.

It appears from the above record that the parties came to an agreement, that is to say, for reasons best known to themselves, they made a compromise, and agreed that the Court should instruct the jury to return a verdict for the plaintiffs for one-half of the land, and for the defendants for the other half. The Court did as requested and the verdict was returned accordingly, which was followed by a judgment in due course. The plaintiffs in fact consented to judgment against themselves

In the Matter of the Boundaries of Pulehunui.

of the land constituting these Islands was included in some division, larger or smaller, which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood. Some persons were specially taught and made the repositories of this knowledge, and it was carefully delivered from father to son.

The divisions of the lands were to a great extent made on rational lines, following a ridge, the bottom of a ravine or depression, but they were often without these and sometimes in disregard of them. Sometimes a stone or rock known to the aboriginals and notable from some tradition, or sacred uses, marks a corner or determines a line. The line of growth of a certain kind of tree, herb or grass, the habitat of a certain kind of bird, sometimes made a division. Through some parts of the country which must always have been unfrequented by the general population, as thick forests, rough and barren mountain lands, their division lines lay, where they could be traced out by some persons at least in charge of the territory, whose business it was to know them.

A principle very largely obtaining in these divisions of territory was that a land should run from the sea to the mountains, thus affording to the chief and his people a fishery residence at the warm seaside, together with the products of the high lands, such as fuel, canoe timber, mountain birds, and the right of way to the same, and all the varied products of the intermediate land as might be suitable to the soil and climate of the different altitudes from sea soil to mountainside or top. But this mode of allotment had numerous exceptions, because some of the lands were for some reasons not always understood, and perhaps arbitrary in the beginning, very wide at the top, cutting off a great number of other lands from the mountain; others in like manner wide in the lowlands, cut off land from the sea.

The contour of lands which have been surveyed and plotted is most irregular. The only general description would be that

31

the lines are not rectilinear, and that there is no preference for right angles. In size ahupuaas are found of from a hundred acres up to thousands, in several instances containing more than one hundred thousand and more than two hundred thousand acres.

The statute which establishes the office of Commissioner of Boundaries prescribes that the holders of lands granted by name only shall apply to such Commissioner for the settlement and determination of the boundaries of what is claimed, presenting a general description of them by "survey or otherwise." After notice to owners of adjacent lands, the Commissioner sits to hear evidence of what are the ancient lines of the land in question, hearing what is offered by the petitioner and adversely to him by others whose interests are affected. He may aid his information by going on the ground, and is to endeavor to obtain all information possible to enable him to arrive at a just decision. An appeal lies to the Supreme or Circuit Court, on record of the evidence of witnesses before the Commissioner, which may be supplemented by further testimony.

The late owner of the Ahupuaa of Pulehunui, Governor W. L. Moehonua, since deceased, having made application to the Commissioner of Boundaries, regular proceedings were had and the Commissioner arrived at a judgment which is formulated in the description notes and map of a certain survey made on behalf of the petitioner, or of the representative of his estate. That is to say, the petitioner showed to the satisfaction of the Commissioner that the survey which he presented and claimed by followed the true and ancient boundaries of Pulehunui. And the judgment of the Commissioner was that Pulehunui be and was by metes and bounds, courses and distances, and area as set forth in his certificate, adopting the notes of the survey.

Appeal is brought to this Court by the owners of the adjacent land of Waikapu. The controversy may perhaps be

made intelligible without a diagram from verbal description. Pulehunui, as given by the Commissioner, contains an area of 16,687 78-100 acres. It extends from the peak of Kilohana on the rim of the crater of Haleakala, at an altitude of 10,000 feet, in a nearly west direction for about fifteen miles. The eastern or mountain portion is comparatively narrow, often less than half a mile wide. The western portion reaches to the low land of the Island and grows broader up to the western boundary joining the lands of Waikapu, being at this end from three to four miles wide.

The matter in dispute is the western boundary. The appellants claim that the judgment of the Commissioner gives Pulehunui about 5,000 acres belonging to Waikapu, which should be cut off from Pulehunui by a western boundary lying within though not parallel to that awarded.

The boundary given by the Commissioner includes about 2,000 feet along the sea coast from a sand spit known as Kihei to a point of rocks called Kalaepohaku. The line claimed for Waikapu would cut Pulehunui off from the sea. This is one of the most explicit issues in the case.

The question before the Court is one of fact, and we deem it proper to set forth the testimony, somewhat at large, as the basis for our comment on its character and force, and the judgment at which we arrive.

Before the Commissioners the following witnesses gave testimony:

Homai says—I was born on Pulehunui and have lived there till now. My parents had the charge of this land. I have had the division of the fish, there being a sea fishery to Pulehunui. I know the boundaries of Pulehunui. Where it joins Waikapu at the sea it runs from Kihei to Kalaepohaku. The boundary joins Kealia pond. The water from the mountain runs to this pond; on the north (or right hand side) of the bed of the stream is Pulehunui, on the south or left hand is Waikapu, and the boundary at the sea shore is a sand hill, not adjacent to the Waikapu sand hills.

In the Matter of the Boundaries of Pulehunui.

The land of Pulehunui extends to Kaopala, which is a level place, Kaopala is an ancient name; where the water ran down and stood still that was called Kaopala. The boundary of Pulehunui ran through Kaopala, the stream or stream-bed being the boundary. At Kaopala the water turned and ran straight down (that is southerly towards the sea and Kealia pond). Kealia belonged to Waikapu. Pulehunui was on the side towards Makawao (east).

Pohakiikii is within Pulehunui. [NOTE.—Pohakiikii is claimed by contestants as the point where Waikapu meets Pulehunui. The petitioners' evidence is that the line continues through Pohakiikii, about two miles in the same (westerly) direction to Kaopala before turning to the south, whereby the difference arises which is here in controversy.]

I lately accompanied the surveyor Monsarratt; had never before been with any other surveyor. Alakoa is in the middle of Pulehunui. Witness here mentions the names of adjacent lands, not affecting the part in dispute.

I know the place called Kihei. It is the boundary between the sea lines of Pulehunui and Waikapu. It is not far from the pond, is seaward from Kohemalamalama, and between them was a settlement. Opunui and Kekua were the men in charge of those fisheries.

Kihei was the boundary (on the coast) of Pulehunui and Waikapu, from thence it ran to Kaopala, thence it turned and followed the gulch up the mountain,   *   *   *.

Pohakiikii is inside Pulehunui. Pulehunui joins Waikapu all the way on the lower end of the land. Kaopala is an ancient water course. The water divides the two lands. Pulehunui has more fixed boundary stones, according to my knowledge.

Kohemalamalama curves and goes in Waikapu,   *   *   *.

Kalama, Imihia, Kekoa and I were the kamaainas who showed Mr. Monsarratt the boundaries of Pulehunui for survey.

In the Matter of the Boundaries of Pulehunui.

We use the word "kamaaina" above without translation in our investigation of ancient boundaries, water rights, etc. A good definition of it would be to say that it indicates such a person as the above witness describes himself to be, a person familiar from childhood with any locality.

M. D. Monsarrat, surveyor, gave testimony that the survey and map before the Commissioner was made along the lines which the above witness and other kamaainas, Kekoa, Kalama, Kalehua and Imihia had pointed out to him. He describes the various landmarks which had been pointed out to him, and in accordance with which he had made the survey. We do not transcribe this because it is not original testimony. What is admissible is, that he has translated the description of the kamaainas into the definite expression of the survey.

Kalama, sworn, says—I have always lived on Pulehunui. I was born there; my ancestors belong there. I am kamaaina (acquainted) with its boundaries. A gully is the boundary that separates it in the side next to Kealialia nui, as far as Kealia, and this is the boundary from old times. Where the waters joined is the boundary from Kumuahane to Kihei. Kihei is a sand spit and it joins Kealia on the Honuaula side. A rocky point is the boundary at the seashore, called Kalaepohaku, thence it runs up following Waiakoa. * * *

Kilohana is the boundary on the mountain, and from Leleiwi it comes straight down, the kahawai (or stream bed) being the boundary to the sea.

Pulehunui is wide at the lower end; there are many rocks on it to this day. Kihei is the boundary between it and Waikapu.

This land formerly belonged to Keaweamahi. All the kamaainas before our time are dead, i. e., we are the only surviving kamaainas. It is a long distance from Kihei to Kaopala. From Kaopala on the boundary is not straight; the land leans or slants till you get to Kilohana.

This Pohakiikii spoken of was a resting place for travelers.

---

Above this is Kaluaolohe, belonging to Pulehunui, and below is all Pulehunui as far as Kaopala. Below Kaopala is Waikapu. Pulehunui has soil and black sand; stones in some places. It is perhaps half a mile from Kaopala to the Waikapu sand hills, though witness cannot well state distance.

Kaopala is where the water from the two mountains (the acclivities of east and west Maui) meet. The former name of the place now called Kaopala, was Kailinawai because there the waters of the two mountains joined, * * *.

Lono, the next witness adduced, was not examined on its appearing that he was not independently acquainted with the boundaries.

Kupaialu, sworn, says—I know Pulehunui and its boundaries because I was born there. It runs from Waiohunu to Kaopala, the gulch being the boundary. From Kaopala it runs towards the coast, the water from the gulch or stream running into the fish pond called Kumuahane. I know Kihei. It is a sand point and from thence the boundary runs to Kalaea, also called Kalaepohaku, belonging to Pulehunui. Mauka of this belongs to Pulehunui and makai to Waikapu.

Witness described the further boundary on the south side beyond the part which is disputed.

Imihia sworn, says—I was born at Kaenaulu Kula, Maui, which place joins Pulehunui, in the time of Kamehameha I. I know Pulehunui and its boundaries. Beginning at Waiohonu and running to the beach, below (makai) Waiohinu is Pohakiikii, below there is Kalapukaolii, below there is Kaopala, thence to Kauahia, thence to Kahuaakapiele, thence to Kapalaoa, thence to Kamuliwaa and from there to Kalaepohaku, Pulehunui had a fishery.

The witness then names localities all round the land. He says, a kahawai (gulch or stream-bed) is the boundary between Pulehunui and Omaopio (one of the lands on the north) and this same kahawai is the boundary between Pulehunui and Kalialianui (next adjoining land). From Omaopio to

In the Matter of the Boundaries of Pulehunui.

Waiolama, to Waiohonu and farther on to Kaopala and from that place to Kealia where the water seems to stand still, the same gulch is the boundary of Pulehunui. Kealia belongs to Waikapu. These boundaries are all plain; from old times down there was no dispute about them. This witness gives the detail and names of localities on the boundaries, with some repetition which we will not report.

Kekoa, the next witness, is one of those who pointed out the boundary to the surveyor. He was born and lives on the adjacent land of Omaopio, and speaking from the local and traditional knowledge, he carries the line from above Pohaku-kii down along the course of a gulch to Kaopala, thence along the junction of the slopes of East and West Maui to the beach and to Kalaepohaku, as petitioner claims.

For the contestants the first witness produced before the Commissioner was Kaupaa, sworn, says—I am a kamaaina of Waikapu; I know the boundary of Pulehunui and Waikapu; beginning at Pohakiikii, from there it runs to Keahuakapiele, mauka of there to where a hole was dug for water, from there to Kamuliwai, a fish-pond belonging to Pulehunui; the boundary is along the edge of the pond separating Pulehunui and Waikapu, running along the wet sand, Pulehunui on the sea, and Waikapu along the land till the boundary called Kihei is reached, dividing Pulehunui and Waikapu makai of the sand hills of Kaopala. This Kaopala belongs to Waikapu, because there is Pohakiikii, which is considered the boundary between Pulehunui and Waikapu.

These are the boundaries as we understand them. Pulehunui had a fishery from Kalaepohaku to Kihei. Kuohia is in Waikapu, and Kaopala is also in Waikapu, but the part where the water stands still belongs to Pulehunui.

Keliikoa, the next witness, says that his knowledge of the boundary is derived from seeing where a party of surveyors made it.

Opunui, the third witness, says—I am a kamaaina of Wai-

kapu.   We used to go mauka (above) of Pohakiikii to snare plover, and this place mauka of Pohakiikii divided Waikapu and Pulehunui.   If the people of Kula came down makai (below) of Pohakiikii it was stealing, and the Waikapu people could take their birds away.

The boundary ran from Pohakiikii to Kanahia, and mauka of Kanahia to a pond at Kealaae, and the water of this pond belonged to Pulehunui, and Waikapu went along the edge. Pulehunui went along the sea to a point called Kaalaepohaku.

There were two Kaopalas, one mauka and one makai.  Kaopala makai belonged to Pulehunui, and Kaopala mauka to Waikapu.   Mauka of Pohakiikii there is a ridge which was a road before it was surveyed.

Ku, the next witness, says he derived his knowledge of the boundaries by going out with a surveyor.   He cannot afford good testimony.

Hoopii, the following witness, only heard of the boundaries from Joe Sylva in going after cattle, and had not seen them.

Kekauai, the next witness, says—Pohakiihii is the boundary of Pulehunui and Waikapu.   I went with John Richardson when he surveyed it.   From Pohakiikii to Keahuakakai, to Kealaaea, where there is a pond.   The upper Kaopala belongs to Pulehunui, the lower to Waikapu.   Kealia belongs to Waikapu.

Malaihi, the next witness, belongs to Kula (adjacent).   There are many opinions about the boundary.   It is a ravine between Kalialinui and Pulehunui; some said the limit was at Pohakiikii, some at Kaopala.   When it rained hard the water ran down to Kaopala and from there to Kealia.

After the evidence taken before the Boundary Commission had been read, the appellants presented several matters to the Court, partly by testimony and partly by statements and exhibits, to the following effect:

The land of Waikapu, belonging to the Government, was set over to the Department of Education.   There is in the

In the Matter of the Boundaries of Pulehunui.

office of the Department a map of Waikapu, and survey notes on a separate paper taken to refer to it. The notes and the names written on the map were in the handwriting of one J. W. Marsh, deceased, who had been a clerk in this Department, but we have no information as to whether he was the surveyor or copied what was in his handwriting, the map and notes being without signature and without date; nor have we any information as to the knowledge on which the survey was made. In 1854 the Department sold ten pieces of land, each containing 1,317½ acres, purporting to be out of Waikapu, for which the Government issued royal patents describing the lots by survey; but for alleged failure to pay the notes taken in the sale all these grants were surrendered and canceled, and quit-claim deeds made back to the Board of Education, dated August, 1860.

These lots are plotted in pencil, with the names of the purchasers, in the handwriting of Mr. Marsh on the Waikapu map, thus taking up the " Waikapu Commons" as therein given. The appellants also exhibit a plot made by Mr. Schussler from the descriptions in the canceled patents, drawn on the same scale as the Monsarrat map, by which it is made to appear that the ten lots extended to include the part of Pulehunui which the appellants claim for Waikapu.

In 1875 the Board of Education sold at auction the "Land known as the Ahupuaa of Waikapu, saving grants hitherto made within said ahupuaa, or sales by the Board of Education," to Henry Cornwell, the Government issuing a royal patent in the above terms without survey or statement of area. Mr. Cornwell afterward sold to Claus Spreckels and others the part known as Waikapu Commons, giving a warranty deed with a surveyed description, perhaps according to the patents, covering as we have said the west end of Pulehunui, as found by the Boundary Commissioner.

The argument for the contestants is that Waikapu was sold by the Government as included in the description in the ten

32

patents, and that there was no claim made against this by the owner of Pulehunui, and that the Government should be holden to have fixed the boundary accordingly.

Now if those patents had not been returned and canceled, the Commissioner of Boundaries could not have found the lines of Pulehunui to include any part of them, whatever proofs might have been given that in fact Waikapu had been wrongly extended beyond its ancient line, for the statute provides that "he shall in no case alter any boundary described by survey in royal patent, in deed from the King, or in Land Commission Award." Section 5, Act of 1868. But these patents having been canceled, cannot be held to have an existence for any purpose. When it is. said for the appellants that there was a good inference or understanding to be taken that the legal boundary was as had been described in them, we think the answer made for the appellee is good; that if any inference is to be drawn it should be that the Government, or the Board of Education, did not have an assurance that Waikapu extended as they had sold it, for it is singular that of the ten pieces sold not one of them should have been paid for and held by the grantees, or that not one of the grantees should have been compelled to pay his note; and it is to be observed very strongly that in the sale made in 1875 the grantor does not convey by any description or area. The purchaser must have taken what might be found to belong to Waikapu, according to its true boundary, as between it and Pulehunui, as it may be found by the Boundary Commissioner.

The Act to facilitate the settlement of boundaries by the appointment of Commissioners, etc., was passed in 1868 in its present form, though the first Act for this purpose was passed in 1862. By the Act of 1868 the owners of divisions of land awarded or patented by name without survey, are required to apply for the settlement of boundaries, and the judgment of Commissioners (subject to appeal) determines what is to be holden as the grant under such award or patent. A

survey and plot which might be in existence in any office of the Government would not in itself be evidence of a boundary, if it had not been incorporated in an award or patent. Even if such a survey were more authenticated in respect to its origin and the data on which it was made than this anonymous one of Waikapu, what would it signify? Nothing but the opinion of the surveyor, on whatever grounds he may derived it, that such and such were the boundaries of the land. But the bounds are to be determined judicially, on evidence, and with notice to all parties concerned. The surveyor is not such an officer, and the tribunal constituted for the purpose cannot take the findings of the surveyor in lieu of or in contravention to proper testimony. We have in our preliminary remarks indicated what is the real subject of investigation of the Commissioner of Boundaries, and the nature of the testimony which is applicable, and it is apparent that no survey, even one founded on good information, can be anything more than secondary evidence when it has been proved to have been so founded, and can be no evidence in itself without proof that it is the expression of original kamaaina direction.

Moreover the purchaser of Waikapu took his patent in view of Section 10 of the Act of 1868, which is: "The Minister of Interior is not authorized, and is hereby forbidden to issue any patent, from and after the passage of this Act, in confirmation of an award by name made by Commissioners to Quiet Land Titles, without the boundaries being defined in such patent according to the decision of some Commissioner of Boundaries appointed under the Act, or by the late sole Commissioner, or the Circuit Court or Supreme Court on appeal."

It is true this patent was not issued in confirmation of an award, the land belonging to the Government, which by this granted a title in fee simple and without commutation, yet it cannot be taken to have confirmed any boundary which had never been legally made and was nowise expressed in it,

neither can it be set up that the good faith of the Government was given that the land followed any survey in existence. The positive statute requiring that lands for which previously a patent without survey had issued should have their boundaries defined by this tribunal, must have held to apply with at least no less force to such a patent issuing after the statute was in existence. The proceedings to settle the boundary of Pulehunui, which must settle that of Waikapu where they join each other, are not affected by this map of Wailuku nor by the following sale of ten lots.

The contestants also introduced as a witness Mr. Keohoka-lole, who said that he had surveyed Pulehunui about twenty years ago. He said he had made his survey after the direction of a party of kamaainas, and that he thought as he remembered it, that he had found the line between Waikapu and Pulehunui more conformed to that on the Waikapu map than that on the Pulehunui (Monsarrat) map, but said that as he had surveyed there was a coast line and fishery, which the Waikapu map does not allow, and that the west end of Pule-hunui reached to the sand and that it bowed in towards Waikapu, instead of Waikapu bowing into Pulehunui. We do not quote this evidence as being quite admissible, but in order to dispose of all that came before us. It does not support the appellants' case, but for what it is worth goes to show that Pulehunui had a coast line as claimed and such a western boundary as petitioner claims.

It thus appearing that the decision of the case must depend on the testimony submitted at the first trial, we make what further examination of it is necessary, briefly, for we have already indicated in our preliminary observations the controlling principles in such cases.

Looking at the testimony of Homai, Kalama, Imihia and Kekoa, we find that they are all of the class of men called kamaaina born and having spent all their lives on Pulehunui or the next lands, who, therefore, have a reason to profess a

In the Matter of the Boundaries of Pulehunui.

knowledge of the ancient, traditional lines of boundary. Homai, whose parents had in charge this land, had himself the office of caring for the fishery. Whether Pulehunui had a fishery or not, which was in his charge as a Pulehunui man, was a fact that he could not make a mistake about. All petitioner's witnesses agree to the fact that there was a fishery and a coast line, and they define the extent of it by existing natural limits, namely, from the sand spit Kihei to the point of rocks Kalaea or Kalaepohaku. On the one side of Kihei was Waikapu, on the other Pulehunui. But the claim of appellants cannot be made, on any of the maps offered by them without cutting off Pulehunui at or above Kalaepohaku, and taking in all the coast to Waikapu. Kaupaa, the first witness for contestant, a Waikapu man, also takes the west boundary across to Kihei and thence to Kalaepohaku, and says that Pulehunui had a fishery. Opunui, their third witness, says that Pulehunui went along the sea from a pond (Kaelia?) to Kalaepohaku. Keohokalole says that the kamaainas who assisted him gave coast and fishery, and no witness says that Pulehunui had no part of the coast. As we have remarked before, this is an issue to be established in claimant's case.

We observe as to the four above named, that they describe the boundary throughout with great local knowledge of particulars, giving names of points and places and the nature of the ground which determines the line, as along a ridge, the edge of a pali, or a gully or water course; and in no part of the line do they testify on surer ground of knowledge than that which is here in question. On the north side, far above the point of variation, they fix the line between this land and Omaopio as being along a kahawai, or ravine. Every witness who speaks of this part, except, perhaps, Opunui, carries the line along this kahawai to Pohakiikii, this rock, which was a resting place, and all of petitioner's witnesses very strongly state that the line of Pulehunui continued to follow the same

natural boundary. They bring it to another locality which has a natural characteristic; Kaopala, where the water ceases to have a current, having reached the bottom of the East Maui slope and meeting the slope from West Maui. Here there is a reason for the boundary turning from its westerly course, and it turns at Kaopala and goes to the Kealia pond, along the depression or kahawai formed by these slopes. We are impressed that this line is a natural and probable one, and that it is such adds weight to the testimony given for it. Our preliminary observation respecting the tendency to observe natural lines applies here. On the other hand, what is the testimony to support the claim that the boundary leaves the kahawai down which it had run at Pohakiikii and turns to the south.

Kaupaa, a witness who claims to know as a kamaaina, says that from Pohakiikii it runs to Keahuakapiele, mauka of these, where is a hole dug for water; from there to Kalaniwai; from there to the river (Kamuliwai). This statement is a bald one. The next witness, Keliikoa, simply says the boundary runs from Kihei to Pohakiikii, and he only knows it because he once saw some surveyors set their flags and make this the line. The third witness, Opunui, speaks more like a kamaaina. He says the boundary was not at Pohakiikii, but at a place farther mauka (east), in this respect differing from contestant's other witnesses. He is not acquainted with the boundary throughout Pulehunui, and he and others with him give Pulehunui a coast line which we understand to be incompatible with contestants' claim.

Without further detail from the testimony of the remaining witnesses we may say that, taking all things together, their means of knowledge, their consistency with each other, and the intrinsic character of their statements, we are compelled to adopt the line made by the petitioner's witnesses. We should disregard the most convincing testimony to take the other view. The great weight of the testimony is on the side

of the petitioner. Even the appellant's witnesses are more consistent with that boundary than with the cut off line.

It is evident to us that for some time past it has been claimed that Waikapu extended to Pohakiikii by the present holders; but no question of adverse possession enters this case. On the matter of what was the true and ancient boundary of the land, we agree with the finding of the Commissioner of Boundaries, and hereby confirm his judgment.